## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JOHN NEWSOME,** | |
| *Plaintiff,* | **Civil Action No. 13-6234** |
| **v.** | **OPINION** |
| **CITY OF NEWARK, et al.,** | |
| *Defendants.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

**THIS MATTER** comes before the Court on Defendants City Of Newark, Sheilah A. Coley, Samuel A. Demaio, and Det. Larry Collins's (together, "Defendants") motion for summary judgment against Plaintiff John Newsome. ECF No. 71. In this case, Newsome sues various members of the Newark Police Department for constitutional violations after he was mistakenly arrested and indicted for assault based on a victim misidentification. Because the Court finds that probable cause existed for his arrest, Defendants' motion is **GRANTED**.

## I. BACKGROUND

This case begins with a violent assault. Around 9 p.m. on October 9, 2011, a group of people with baseball bats attacked Jermain Bruce on a street in Newark, New Jersey. Defs.' Statement of Undisputed Material Facts ("SMF") ¶¶ 9-10. ECF No. 71-2; Lipshutz Cert. Ex. C, Incident Rpt. 4. When police arrived on the scene, they found Bruce bruised and handcuffed to a gate. Defs.' SMF ¶ 11; Incident Rpt. 4. The attack happened down the street from his home, an apartment above a daycare center. Defs.' SMF ¶ 9. Though hurt, Bruce could communicate some facts to the officers. He told them that there were five attackers: two men and three women. Id. ¶ 12. He could identify one of them, a man named Adrian, but not the other four. Id. He also told

the officers why he believed it happened: the five attackers worked at the daycare center and jumped him because they thought he was responsible for a recent break-in there. Id. Bruce spent the night in the hospital and was released the next morning. Lipshutz Cert. Ex. B, Audio Statement of Jermain Bruce dated Oct. 12, 2011 ("Audio Statement") 14:18-15:10.

Defendant Larry Collins, a detective in the Newark police department, was assigned to investigate the case. Id. ¶¶ 7-13. Three days after the attack, Collins took an audio statement from Bruce at the police station. Id. ¶ 14; Audio Statement 1:4-12. Bruce reiterated much of what he had told the responding officers. He said he was attacked by the daycare owner's son Adrian, whom he described as "the fat one"; the owner's three daughters, whose names he did not know; and another man, all of whom he had seen daily at the daycare. Id. ¶¶ 15, 16; Audio Statement 12:2-23. He could not remember the other man's name but said the man was the daycare owner's "husband" and the other attackers' "father" and "stepfather." Id. ¶ 17; Audio Statement 6:8-8:23. Bruce, a Black man in his 30s, described the unknown man as light skinned, bald, and "a little slimmer" than Adrian, though he could not guess the man's age. Incident Rpt. 4; Audio Statement 16:11-17:15. Bruce also said the man was "a little bit taller than" Collins, who is 6'2", and "a little shorter than" Bruce, who is 6'5". Audio Statement 16:13-17:2.

Bruce also told Collins he could recognize the assailants if he saw them again because he "see[s] them every day coming out of the daycare center . . . ." Audio Statement 14:11-16. So Collins showed Bruce photographs in a mugshot system called "HIDTA," which displays six results at a time. Defs.' SMF ¶¶ 20-22. Collins began by searching the system for mugshots of men named Adrian. Id. ¶ 21. Bruce identified a photo of Adrian Zimmerman. Id. ¶ 23.

Collins then tried to find matches for the other male assailant. Id. ¶ 24. He searched for people matching Bruce's description of the man's physical attributes, but Bruce reviewed "several

hundred[ ]" photos over about 15 to 30 minutes without recognizing the second attacker.  Id. ¶ 25; Lipshutz Cert. Ex. D, Collins Dep. 48:6-49:21.  Collins tried another tack.  He remembered that Bruce mentioned the daycare center several times—the alleged break-in happened there, Bruce recognized the attackers from there, and the attackers were related to the daycare owner—so Collins looked for a link between the unknown man and that location.  Defs.' SMF ¶¶ 26-27; Collins Dep. 51:8-52:10.  He entered the daycare's address into another system known as the Accurint database.[1]  Defs.' SMF ¶ 28.  It returned 33 names of people who have had a connection with the address at some point.  Id. ¶ 29.  Collins cross-referenced the names of any men on that list with their DMV records, and showed Bruce the photos one at a time as the system retrieved them.  Collins Dep. 55:20-56:14, 72:1-3.  It is unclear how many DMV photos Bruce reviewed, but one was of Plaintiff John Newsome.  Collins Dep. 56:12-22; Defs.' SMF ¶ 32.

Collins came across Newsome's name through an indirect match to the daycare.  The eleventh Accurint result showed that a woman named Robin Newsome had some association with the daycare address in June 2006, and that she now lives with John Newsome in Glassboro, New Jersey, which is about 96 miles from the daycare in Newark.  See Lipshutz Cert. Ex. E, Accurint Search Results I at bates stamp 45; Collins Dep. 69:18-71:25.

When Bruce saw the photo, he identified Newsome as the other male attacker.  Defs.' SMF ¶ 32.  The photo showed a light-skinned black man with a bald head.  Id. ¶ 35.  Collins had Bruce sign and date the photo of Newsome.  Id. ¶ 36.  Collins noticed that Newsome's height in the DMV database (5'9") did not match Bruce's description (6'2" to 6'5").  Id. ¶¶ 33-34.  He also ran a background check on Newsome and found he had no criminal history.  Collins Dep. 72:12-20.

---

[1] "Accurint is an online database that contains up-to-date information about postal addresses." United States v. Colon, 386 F. App'x 229, 230 n.1 (3d Cir. 2010).

Collins then ran a new Accurint search with the Glassboro address and Newsome's name appeared again, listing the location as his probable current address. Defs.' SMF ¶ 37; Lipshutz Cert. Ex. F, Accurint Search Results II at 1. Based on what he learned that day, Collins believed he had probable cause to arrest Newsome. Defs.' SMF ¶ 43; Collins Dep. 73:24-74:5.

Collins then wanted Bruce to identify the three women. Defs.' SMF ¶ 38. During their conversation that day, Collins recognized that Bruce was in pain but felt that Bruce was otherwise relaxed, calm, and seemed reliable. Collins Dep. 50:17-51:1. But at that point Bruce said he was in too much pain to continue. Defs.' SMF ¶ 38. Collins told Bruce to call back to finish the identification process, but Bruce never did. Id. ¶ 40.

The next day, October 13, 2011, Bruce called Collins to report that Zimmerman was in the daycare, so Collins called local officers who arrested Zimmerman without a warrant. Collins Dep. 74:17-79:11, 94:6-18. Collins told Bruce to call if he saw any other suspects, but again Bruce never did. Id. 94:12-21.

Meanwhile, Collins prepared a warrant for Newsome's arrest. Id. ¶ 44. At his deposition, Collins explained the usual process for securing an arrest warrant: He would take the typed warrant, cover letter, and any other integral paperwork to the Essex County Prosecutor's Office where he would explain the case to an assistant prosecutor; if the assistant prosecutor agreed that probable cause for the arrest existed, the prosecutor would sign the cover letter; Collins would then take the documents to the court and present them to the judge, who would decide whether the warrant should issue. Collins Dep. 79:4-81:18. Meanwhile, the reviewing prosecutor would fill out an internal screening form indicating his or her probable cause determination, and keep the form on file with the Prosecutor's Office for its own records. Ocasio Aff. ¶¶ 4-5, ECF No. 71-24; id. Ex. A, Screening Form.

Collins claims that, on October 31, 2011, he presented the warrant, cover letter incident report, audio statement, and signed photograph of Newsome to an assistant prosecutor. Defs.' SMF ¶¶ 45-46. The assistant prosecutor affirmed the existence of probable cause to arrest Newsome and signed the cover letter. Id.; Collins Dep. 81:19-82:5. However, the Essex County Prosecutor's Officer searched its records and does not have a probable cause screening form for the Newsome arrest warrant. Ocasio Aff. ¶ 8. But Collins's timesheets for that day show that he spent 30 minutes at "31 Green Street," which is the same address as the Essex County Prosecutor's Office's satellite office where prosecutors review search warrants for probable cause. Lindsay Cert. Ex. B, Collins Activity Report at 31, ECF No. 81-4; Ocasio Cert. ¶ 3.

Later that day, Collins appeared in person at the City of Newark Municipal Court before the Hon. Dion Williams, J.M.C., with the documents relating to Bruce's assault and made an oral application for a warrant for Newsome's arrest. Defs.' SMF ¶ 48; Collins Dep. 86:3-8. Collins asserts that he told Judge Williams why he believed probable cause existed for the arrest. Defs.' SMF ¶ 49. He also told Judge Williams about "the basis of the case," that he took an audio statement taken from Bruce and provided the transcript, explained "how the identification [of Newsome] was made," and gave Judge Williams the photograph of Newsome that Bruce signed. Collins Dep. 101:3-25. Collins maintains that he made these statements under oath on the record in Judge Williams's courtroom before the judge and other court staff. Id. 102:1-23. However, like the probable cause screening form, the audio recording of Collins's application before Judge Williams is missing from the Municipal Court's records. Lindsay Cert. Ex. D, Letter from Newark Municipal Court to Mr. Lindsay, ECF No. 81-6.

Judge Williams issued the warrant, a copy of which is in the record. Lipshutz Cert Ex. G, Warrant dated Oct. 31, 2011 ("Arrest Warrant"). He signed the warrant and checked the box

stating "Probable cause is found for the issuance of this complaint" and authorized any officer of the peace to arrest Newsome.  Id.

On November 1, 2011, Newsome was arrested at work in Bridgeton, New Jersey.  Id. ¶ 51. The next day, Collins picked up Newsome from the Cumberland County Correctional Facility and took him to the precinct in Newark.  Id. ¶¶ 52-54.  There, Newsome told Collins that he knew the daycare because his "wife's father happens to own that building that the daycare center is in."  Id. ¶¶ 55-56, 67 n.2; Lipshutz Cert. Ex. H, Newsome Dep. 45:5-17.  In other words, although Newsome was not married to the woman who owned the daycare, he was married to the woman whose father owned the building.  After four days in jail, Newsome was released on bail.  Id. 47:5-49:2.

On February 7, 2012, Collins testified before the Grand Jury regarding Newsome's involvement in Bruce's attack.  Id. ¶ 57.  Collins testified that Bruce identified the male attacker as the "boyfriend" of the daycare owner and that he used Bruce's description of the attacker to select the photo of John Newsome.  Id. ¶ 58.  Collins also testified that Bruce identified Newsome as one of the men who assaulted him.  Id. ¶ 59.  The Grand Jury returned a five-count indictment against Newsome and Zimmerman for conspiracy to commit aggravated assault, aggravated assault, unlawful possession of a weapon, possession of a weapon for an unlawful purpose, and criminal restraint.  Id. ¶ 60.

On October 12, 2012, the Superior Court of New Jersey, Essex County, held a Wade hearing to determine the validity of the identification.  Id. ¶ 61.  At the hearing, Collins testified that Bruce was "[a]bsolutely positive" that the photo of Newsome was the second male attacker. Id. ¶ 62; Lipshutz Cert. Ex. L, Wade Hearing Tr. 29:2-13.  Collins also testified that it was appropriate to show individual photos to Bruce because Bruce knew the unknown male attacker,

having seen him at the daycare before and believing he was related to the other attackers and the daycare owner. Defs.' SMF ¶¶ 63-64. Collins explained that if it had been a stranger-on-stranger crime, he would have used a photo array and another detective with no involvement in the case would have presented the array to Bruce. Wade Hearing Tr. 32:1-6. Collins explained that these were the acceptable procedures "under the published guidelines," id. 30:1-11, though he admitted he did not know the "guidelines for eyewitness identification . . . word-for-word." Id. 32:14-16. Collins also testified that he subsequently (though he does not say when) spoke to the daycare owner, who said she did not know Newsome. Id. 35:4-9. Collins said he later learned that Newsome was related to the building owner. Id. 31:6-11.

Collins had no other role in the case besides investigating to secure the arrest warrant and testifying before the grand jury and during the Wade hearing. Collins Dep. 89:1-90:8.

Apparently, the Superior Court never ruled on the Newsome identification, see State v. Zimmerman, No. A-5770-14T1, at 2 n.2 (N.J. Sup. Ct. App. Div. May 23, 2017) (per curiam) (available on this Court's docket at ECF No. 85-2), probably because of what happened next. After the hearing, the Assistant Essex County Prosecutor (the "AP") spoke with Newsome's attorney about a possible misidentification. Defs. SMF ¶ 76; Lipshutz Cert. Ex. O, Morris Dep. 29:16-30:16. The issue came to the AP's attention because Bruce made inconsistent statements after Newsome's arrest and indictment. Morris Dep. 26:23-28:3. Several months earlier, in August 2012, Newsome and an investigator hired by Newsome's attorney went to Bruce's home, and Bruce signed a handwritten statement that he was "absolutely positive" Newsome was not the unknown attacker. Defs.' SMF ¶ 68-71. But on October 11, 2012, the day before the Wade hearing, Bruce told a detective with the Essex County Prosecutor's Office that Newsome was the attacker. Id. 72-74. There is no evidence that Collins knew about either statement. But when the

AP learned about them, he reached out to Adrian Zimmerman's attorney about a potential misidentification.  Id. ¶ 77; Morris Dep. 27:15-18, 31:11-32:1.  After speaking with Zimmerman, the attorney told the AP that Zimmerman denied Newsome's involvement in the attack and did not know who Newsome was.  Id.

Based on Zimmerman's statement, the AP reviewed the transcript of Bruce's audio statement.  Defs. SMF ¶ 79.  The AP learned that Bruce referred to the second male assailant as Adrian's "stepfather" and at that point realized that all of the attackers were members of the same family.  Id. ¶ 80.  At the AP's directive, another detective identified Zimmerman's stepfather as Herbert Elijah.  Id. ¶¶ 82, 83.  Elijah's photo looked similar to Newsome's, including a bald head, similar facial features, and skin tone.  Morris Dep. 35:2-36:2.  When Bruce saw the photo, he confirmed that Elijah was the second attacker.  Id. 36:24-37:3.  So Morris prepared a dismissal of the indictment against Newsome and eventually obtained a superseding indictment against Elijah.  Defs. SMF ¶ 87; Morris Dep. 37:7-12.

Two years later, Zimmerman and Elijah went to trial.  Id. ¶ 88.  Bruce testified that he initially identified Newsome as the unknown attacker but was mistaken.  Id. ¶¶ 89, 91.  He said he did so because Newsome and Elijah looked alike.  Id. ¶ 90.

In October 2013, Newsome brought this lawsuit against Detective Collins, the City of Newark, Newark Chief of Police Sheilah Coley, Director of Police Samuel Demaio, and Detective Paul Sarabando.  Newsome brought claims for (1) false arrest and malicious prosecution under 42 U.S.C. § 1983 against Collins (Counts One and Two); (2) supervisory liability under 42 U.S.C. § 1983 against the City of Newark, Chief Coley, and Director Demaio (Count Three); and (3) false arrest, false imprisonment, and malicious prosecution under New Jersey law against Collins and the City of Newark (Count Five).  Previously, the Court dismissed Counts Four and Six, which

were against Detective Sarabando for malicious prosecution, based on prosecutorial and qualified immunity.  <u>See</u> Opinion and Order dated Sept. 25, 2014 (Cecchi, J.), ECF No. 39.

Defendants filed the instant motion for summary judgment on all remaining counts.

## II.  LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with available affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  "[S]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."  <u>Miller v. Ind. Hosp.</u>, 843 F.2d 139, 143 (3d Cir. 1988).  All facts and inferences must be construed in the light most favorable to the non-moving party.  <u>Peters v. Del. River Port Auth.</u>, 16 F.3d 1346, 1349 (3d Cir. 1994).

## III.  ANALYSIS

Defendants assert several reason why they are entitled to summary judgment.  They focus mostly on why Collins's false arrest and malicious prosecution claims fail, and argue that a holding in Collins's favor precludes liability against the City of Newark, Chief Coley, and Director DeMaio.  As such, the Court will address Collins's arguments first.

Collins argues that he is entitled to qualified immunity for the false arrest and malicious prosecution claims.  That is, he argues that Newsome has not demonstrated that a deprivation of his constitutional rights occurred; and, if a deprivation occurred, the rights were not clearly established at the time of the violation.  <u>Wilson v. Russo</u>, 212 F.3d 781, 786 (3d Cir. 2000)

(citations omitted).  Because the Court determines that Newsome has not shown that a deprivation occurred, the Court will end its analysis there.

### A.  Section 1983 False Arrest Claim against Collins (Count 1)

To assess claims of false arrest, the court must determine whether "the arresting officers had probable cause to believe the person arrested had committed the offense."  Dowling v. City of Philadelphia, 855 F.2d 136, 141 (3d Cir. 1988).

Newsome claims that his Fourth Amendment rights were violated when he was arrested without probable cause.  He admits he was arrested pursuant to a warrant, but challenges the probable cause determination underlying the warrant for three reasons:  (1) Bruce was an unreliable witness; (2) the photo identification of Newsome was unreliable; and (3) Collins overlooked exculpatory evidence.  Newsome claims that if Collins applied for the warrant without Bruce's statements or photo identification and with the exculpatory evidence, the warrant would not have issued.

#### 1.  *The Probable Cause Determination*

The Fourth Amendment prohibits police from making an arrest except "upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV.  "Probable cause exists if there is a 'fair probability' that the person committed the crime at issue."  Wilson v. Russo, 212 F.3d 781, 789 (3d Cir. 2000) (quoting Sherwood v. Mulvihill, 113 F.3d 396, 401 (3d Cir. 1997)).  Put another way, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."  Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995).

An officer seeking an arrest warrant on the basis of probable cause must follow a two-step process: First, the officer swears out an affidavit providing a summary of the events giving rise to probable cause. Dempsey v. Bucknell Univ., 834 F.3d 457, 469 (3d Cir. 2016); see also Schneider v. Simonini, 163 N.J. 336, 363 (2000) ("When a search or seizure is made pursuant to a warrant, the probable cause determination must be made based on the information contained within the four corners of the supporting affidavit, as supplemented by sworn testimony before the issuing judge that is recorded contemporaneously."). In doing so, the officer "is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." Wilson, 212 F.3d at 790 (citation and quotes omitted). Rather, the officer must "include in the affidavit all information 'any reasonable person would know that a judge would want to know' in making a probable cause determination.'" Reedy v. Evanson, 615 F.3d 197, 213 (3d Cir. 197) (quoting Wilson, 212 F.3d at 783). Second, "the officer presents the affidavit to a neutral magistrate, who conducts his own independent review of the evidence to determine whether it does, in fact, establish probable cause, and, if so, issues a warrant." Dempsey, 834 F.3d at 469.

An officer can be sued for false arrest even if the officer arrested the person pursuant to a warrant. See Sherwood, 113 F.3d 399. In such cases, the plaintiff must show that (1) the officer recklessly or deliberately made false statements or omissions in applying for a warrant, and (2) "those assertions or omissions were material or necessary to the finding of probable cause." Dempsey, 834 F.3d at 468-69 (quoting Wilson, 212 F.3d at 786; Sherwood, 113 F.3d at 399) (internal quotations omitted).[2] Since Newsome was arrested pursuant to a warrant, this test will guide the Court's analysis.

_____

[2] District courts must analyze probable cause at the summary judgment stage in the following way:

Two principles underlie this test.  First, the court must review the record to see if the government followed the proper procedure for determining probable cause as explained above.  Id. at 469-70.  Second, if the procedure was not followed, the court must conduct the procedure on its own to see if probable cause existed despite the error.  Id. at 470.  This requires the court "to perform [a] literal, word-by-word reconstruction[ ] of the challenged affidavit" submitted to the neutral magistrate  Id.; see also Andrews v. Scuilli, 853 F.3d 690, 699-700 (3d Cir. 2017).   In drafting the reconstructed affidavit, the court "must identify any improperly asserted or omitted facts and, if it determines there were reckless misrepresentations or omissions, 'excise the offending inaccuracies and insert the facts recklessly omitted' from the affidavit and assess whether the reconstructed affidavit would establish probable cause."  Dempsey, 834 F.3d at 470 (quoting Wilson, 212 F.3d at 789).   If the corrected reconstructed affidavit would establish probable cause, the plaintiff's false arrest claim fails because there would have been probable cause for the arrest had the proper procedures been followed.  Id.

## 2.  *Reconstructing an Affidavit When the Original Affidavit is Missing*

It is clear from Dempsy and Andrews that the Third Circuit requires adherence to the step-by-step process for evaluating probable cause in a warrant affidavit.  But in those cases, the original

---

While it is axiomatic that at the summary judgment stage, we view the facts in the light most favorable to the nonmoving party, it does not follow that we exclude from the probable cause analysis unfavorable facts an officer otherwise would have been able to consider. Instead, we view all such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a "fair probability" that a crime occurred. Only then would the existence of conflicting evidence rise to the level of a "genuine dispute as to any material fact" such that summary judgment would be inappropriate. Thus, where the question is one of probable cause, the summary judgment standard must tolerate conflicting evidence to the extent it is permitted by the probable cause standard.

Dempsey, 834 F.3d at 468.

affidavit presented to the magistrate was in the record for the district court to review. That is not the case here.

In this case, the Municipal Court of the City of Newark was required to either record or summarize Collins's oral application. See N.J. Ct. R. 3:2-3(b) ("If the law enforcement officer provides additional sworn oral testimony in support of probable cause, the judicial officer shall contemporaneously record such sworn oral testimony by means of a recording device, if available; otherwise, adequate notes summarizing the contents of the law enforcement applicant's testimony shall be made by the judicial officer."). But for some reason the Municipal Court either lost or never made the recording or summarization. Neither party contends this happened in bad faith. But they recognize that it hinders the probable cause determination's word-for-word reconstruction requirement.

That raises a thorny issue. How should a district court carry out the probable cause determination when it does not have access to and thus cannot review the warrant affidavit? The Third Circuit has not squarely addressed this issue, so the Court must look elsewhere.[3]

_____

[3]  For their part, Newsome and Collins offer their own solutions. But neither one is persuasive. Collins argues that the lost affidavit is fatal to Newsome's case. He contends that since the affidavit is missing, Newsome cannot show that Collins made misstatements or omissions before Judge Williams. Thus, Collins says, "this Court cannot conclude as a matter of law that there is any material issue of fact that Detective Collins did anything wrong in the warrant application." Defs.' Br. 18, ECF No. 71. Collins does not cite to any authority for his novel solution.

Indeed, the Court finds it unpersuasive for three reasons. First, it would be a categorical bar to false arrest claims where there is no affidavit. Such a rule would be problematic. It would do away with the court's role in reviewing the magistrate's probable cause determination, the purpose of which is to ensure that law enforcement officers and magistrates faithfully adhere to the two-step process for obtaining an arrest warrant. See Dempsey, 834 F.3d at 469 ("[F]ederal courts review the record to ensure that the proper procedure for determining probable cause was followed."). The Court will not remove such "an integral part of the constitutional armory safeguarding citizens from unreasonable searches and seizures." State v. Valencia, 93 N.J. 126, 136 (1983). Second, it is simply unfair. There is no reason to punish Newsome for the Municipal Court's failure to preserve the supporting documents. Third, the procedure for recording affidavits

Other Circuit Courts of Appeal have held that where the contemporaneous record of an application for an arrest warrant is missing because of accidental error, the Court can use extrinsic evidence to reconstruct the contents of the affidavit and decide whether such contents gave rise to probable cause. See United States v. Chaar, 137 F.3d 359, 361-63 (6th Cir. 1998) (permitting reviewing court, when records of warrant application are missing, to conduct "searching and skeptical" review of "any evidence available after the fact"); United States v. Richardson, 943 F.2d 547, 549 (5th Cir. 1991) (holding that, given the accidental absence of a recording or transcript, it was appropriate for a reviewing court to use extrinsic evidence from the officer and the magistrate to examine the circumstances surrounding the issuance of the warrant); United States v. Lambert, 887 F.2d 1568, 1571-72 (11th Cir. 1989) (holding that "other evidence may be presented to establish the fact that an affidavit was presented, as well as its contents"); United States v. Stefanson, 648 F.2d 1231, 1235-36 (9th Cir. 1981); see also Wayne R. LaFave, 2 Search and Seizure: A Treatise on the Fourth Amendment § 4.3(c) & n.42 (5th ed. 2016) (collecting cases where at least part of contemporaneous record of warrant application missing).

---

exists because it "removes any hint of misconduct or bad faith by the prosecutor or the police." State v. Myers, 815 P.2d 761 (Wash. 1991) (en banc) (citing State v. Fariello, 71 N.J. 552, 559 (1976) (describing practice of memorializing warrant application as "a prophylactic procedure")). Collins's rule would undermine confidence in the procedural system and invite abuse by the rare bad actor.

Newsome, on the other hand, argues that he automatically survives summary judgment because the missing affidavit creates a dispute of fact as to whether probable cause existed. That argument goes too far in the other direction. Newsome should not be entitled to a windfall simply because the affidavit is missing, particularly where there is no evidence that the named defendants in this case are at fault. Newsome also argues that "the question should simply be whether or not under the totality of the circumstances, the officer had probable cause to seek a warrant." Opp'n Br. 16, ECF No. 81. That suggestion is also unpersuasive because it moves too far from Dempsey, Wilson, and Reedy, in which the Third Circuit stressed that the probable cause determination involves a review of the facts presented to the neutral magistrate during the warrant application, not of any and all facts that existed in the universe at the time.

This solution strikes an appropriate balance. It prevents either party from gaining too much leverage from the fact that documents are missing when neither party is to blame for the mistake. And it allows both parties to present evidence about the existence or absence of probable cause to the Court so that the Court can carry out its obligation to review the validity of the arrest warrant. If there are no disputes of material fact as to the contents of the affidavit and supporting documents the Court will decide the probable cause issue as a matter of law. But if there are disputes then summary judgment is inappropriate and the fact questions will be resolved by a jury.

### 3. *Extrinsic Evidence Available Here*

In this case, there are several pieces of extrinsic evidence that establish the contents of Collins's application to Judge Williams. First, there is Collins's deposition testimony. Collins does not have a "word-for-word" recollection of what he told Judge Williams that day, but he recalled much of it. Collins Dep. 86:6-11. He stated that he appeared before Judge Williams in person, was sworn in, and "explain[ed] to him how I come to identify Mr. Newsome[,] . . . the basis of the case, what kind of case it was, how the identification was made and that the audio statement was taken from [Bruce]." Id. 100:19-21, 101:3-11. He also stated that he gave Judge Williams the photograph of Newsome signed by Mr. Bruce, a copy of the incident report from the night of the attack, and a copy of the audio statement. Id. 101:14-25.

The Court accepts Collins's version of the warrant application as true. There is no evidence in the summary judgment record to contradict Collins's testimony. And Newsome does not really dispute it. He did not try to impeach Collins's testimony during the deposition, and did not depose

or seek an affidavit from Judge Williams or anyone else present in the courtroom that day to dispute Collins's story.[4]  Nor has he claimed that he could not obtain such evidence in discovery.

Nothing in Newsome's opposition brief challenges the veracity of Collins's version of the application either.  <u>See</u> Opp'n Br. 17 ("[I]n this case there is substantial evidence regarding the statements Collins likely made to the magistrate.").  Newsome mainly argues that Collins's version of the application did not give rise to probable cause.  For example, he agrees that Collins used a single-photo presentation.  He simply contends that the identification was so unreliable that Judge Williams should not have considered it.  And although Newsome and Collins disagree whether Collins omitted certain exculpatory facts, like the height difference or lack of criminal record, we will assume for the purposes of the summary judgment that Collins did omit those facts.  With that assumption, the Court can determine whether probable cause would have existed if Judge Williams considered the omitted facts too.

Beyond Collins's testimony, the summary judgment record also contains the supporting documents given to Judge Williams.  Collins has provided the Court with copies of the incident report, a transcript of Bruce's audio statement, and the photograph of Newsome that Bruce signed and dated, as well as copies of the Accurint search results linking Newsome's wife to the daycare address and Newsome to his wife's current address.  Newsome does not contest the authenticity of any of these documents, so the Court will accept their contents as true as well.

---

[4] This is the approach taken in some other cases involving lost warrant affidavits.  <u>See</u> <u>Chaar</u>, 137 F.3d at 363 ("[T]he fact that there was no testimony to refute [Officer] Krappmann's testimony, from either Magistrate Judge Hooe, Oberg or anyone else present in the courthouse when the warrant was issued, redounds to [the plaintiff's] detriment."); <u>see also</u> <u>Richardson</u>, 943 F.2d at 549 ("Since the court could not review a tape or transcription of the telephone call between Crews and the magistrate, it acted well within its discretion in basing its decision on a thorough review of the testimony of [Officer] Crews and the magistrate."); <u>U.S. v. Campbell</u>, 525 F. Supp. 2d 891, 902, (E.D. Mich. 2007) (describing government's interview of magistrate after affidavit and supporting documents went missing)

### 4. *The Reconstructed Affidavit for Newsome's Arrest based on Extrinsic Evidence*

Based on this extrinsic evidence, the Court can reconstruct the following application before Judge Williams:

> On Sunday, October 9, 2011 at 8:42 p.m., two City of Newark police officers responded to an assault in progress at the corner of 18th Avenue and West End Avenue in Newark, New Jersey. Upon their arrival, the officers saw Jermain Bruce injured and handcuffed to a grate. Bruce told the officers that two men, one by the name of Adrian, approached him with three unknown women and accused him of breaking into the day care center located in the same building where Bruce lives. The five people attacked him with metal bats and handcuffed him. Bruce said that the people who attacked him worked at the daycare. Bruce suffered minor bruises, swelling, and a broken nose.

> On October 12, 2011, Detective Collins took an audio statement from Bruce. Bruce identified the other unknown man as the daycare owner's husband and Adrian's stepfather. Bruce told Collins that he could recognize the attackers if he saw them again. He described the unknown man as light-skinned, bald, slim, and about 6'2" to 6'5".

> Collins entered the unknown man's description into the HIDTA system, but Bruce did not recognize him from hundreds of photos. Collins then showed Bruce individual photos of men in the Accurint system who had a connection to the daycare address through a woman with his same last name. Bruce identified the DMV photograph of John Newsome as the other male attacker. According to his DMV photo, Newsome is light-skinned and bald. Bruce signed and dated the photo of Newsome.

> Based on the facts enumerated above, the affiant contends that a warrant should issue on probable cause that John Newsome committed aggravated assault against Jermain Bruce.

### 5. *The Probable Cause Determination Applied to the Reconstructed Affidavit*

The Court is satisfied that this warrant affidavit establishes probable cause to arrest Newsome. It informed Judge Williams that an assault took place; the victim said he was attacked by a male suspect; the victim described the suspect, said he had seen him often at the daycare, and said the suspect was married to the daycare owner; the victim's description of the suspect was used to generate a photo identification process; the victim positively identified Newsome without

hesitation; and Newsome lives with a woman who used the daycare's address.  From these facts, the warrant affidavit presents a "fair probability" that Newsome committed the assault.  See Sherwood 113 F.3d at 401.

Since the warrant affidavit facially establishes probable cause, the Court focuses on two elements:  first, did Collins make false statements or omissions with at least a reckless disregard for the truth when he applied for the warrant; and second, were those assertions or omissions material or necessary to the finding of probable cause?  See Dempsey, 834 F.3d at 468-69 (citations and quotes omitted).

Assertions and omissions receive different treatment.  An assertion "is made with reckless disregard when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported."  Wilson, 212 F.3d at 788 (citation and quotes omitted).  "Misleading assertions can relate to even minor details, and do not need a separate determination of relevance."  Andrews, 853 F.3d at 698.  The focus in these instances is upon evidence demonstrating that the affiant willingly and "affirmatively distort[ed] the truth."  Wilson, 212 F.3d at 788.  An omission is made with reckless disregard when "an officer withholds a fact in his ken that [a]ny reasonable person would have known . . . was the kind of thing the judge would wish to know."  Id. (citation and quotes omitted).

Here, Newsome offers two main reasons why the warrant was invalid:  first, the warrant affidavit should not have included (i) Bruce's description of the incident because he was an unreliable witness, or (ii) the photo identification of Newsome because the identification procedure

was unreliable; and second, Collins omitted exculpatory evidence.  Opp'n Br. 18-25.[5]  The Court

will address reach in turn.

#### i.   Reliability of Victim Statements

There is a presumption that information provided by a victim or witness to a crime carries

an indicia of reliability.  <u>Greene v. City of Philadelphia</u>, No. 97-4264, 1998 WL 254062, at *7

(E.D. Pa. May 8, 1998); <u>see also</u> <u>Sharrar v. Felsing</u>, 128 F.3d 810, 818 (3d Cir. 1997) (citation

omitted) (noting that when police receive reliable identification by a victim of an attacker there is

probable cause to arrest) <u>abrogated on other grounds by</u> <u>Curley v. Klem</u>, 499 F.3d 199, 209-11 (3d

Cir. 2007); <u>Grimm v. Churchill</u>, 932 F.2d 674, 675 (7th Cir. 1991) ("When an officer has received

his information from some person—normally the putative victim or an eye witness—who it seems

reasonable to believe is telling the truth, he has probable cause.") (internal quotes omitted).  "The

skepticism and careful scrutiny usually found in cases involving informants . . . is appropriately

relaxed if the informant is an identified victim." <u>Sharrar</u>, 128 F.3d at 818 (quoting <u>Easton v. City</u>

<u>of Boulder</u>, 776 F.2d 1441, 1449 (10th Cir. 1985)).

Here, Newsome argues that Bruce's audio statement was unreliable because it conflicted

with the incident report, Collins "encouraged" Bruce to say he knew the suspects, and Bruce had

"questionable comprehension, memory, and language skills, [and was] in pain at the time of the

interview."  Opp'n Br. 18-19.

---

[5] These appear to be Newsome's theories of liability.  His brief, however, does not phrase his
theories in exactly this manner.  Instead, he argues simply that Bruce's statement was unreliable,
the photo identification was suggestive, and Collins omitted exculpatory evidence.  But he does
not tie those arguments back to the warrant affidavit, as the Third Circuit requires.  <u>See</u> <u>Andrews</u>,
853 F.3d at 701 ("[O]ur materiality review centers on whether any of the misleading assertions
and omitted facts that we corrected in our reconstructed affidavit could outweigh [the]
identification . . . .").  Nonetheless, the Court reads that as the import of his argument.

Newsome's first claim that certain facts in the incident report contradict facts in the audio statement is unpersuasive. Newsome points to two inconsistencies: The incident report states that the attackers accused Bruce of the robbery and then beat him, but the audio statement states that the beating happened first; and the incident report states that Bruce could not identify the person who handcuffed him, but the audio statement states that the handcuffer was the "light-skinned one." Opp'n Br. 4 (quoting Audio Statement 16:1-2). These differences do not render Bruce unreliable. Consider the order of events first. The Court agrees that Bruce's descriptions are inconsistent as to the order of the attack and accusation. But that is a trivial inconsistency. Wilson, 212 F.3d at 791 (stating that courts have "concluded that discrepancies in the victim's description were 'trivial, given their nature' and in light of [a] positive identification . . . .") (quoting Lallemand v. University of R.I., 9 F.3d 214, 217 (1st Cir. 1993)). The order of the events does not impact probable cause and does not reveal much about Bruce's reliability. Meanwhile, Bruce demonstrated reliability by explaining much more material facts in a consistent manner. For example, Bruce explained in both the incident report and audio statement that the group attacked him because they thought he broke into the daycare, that there were five attackers, and that one of the attackers was named Adrian. Given Bruce's consistency on these salient facts, Collins should not have ignored Bruce's statement just because he mixed up the order in which the accusations and attack occurred, particularly since the statements came from a victim, not a third-party witness.

The Court reaches the same result as to his ability to identify the person who handcuffed him. In the incident report, which was taken on the heels of the attack that rendered him briefly unconscious, Bruce said he did not recall who handcuffed him. But in his audio statement, taken a few days after the event, Bruce said it could be the unknown male attacker. It is unsurprising

that Bruce was able to recall more of the incident after having some time to recuperate and reflect on it. This fact also did not impact Bruce's reliability.

Newsome next claims that Collins "encouraged" Bruce to say he knew the suspects. That is not reflected in the record. Rather, it was Bruce who offered the information first. In the incident report, Bruce told the officers that he knew one of his attackers as Adrian and "state[d] the individuals who attacked him work at Yasmiyns [sic] day care . . . ." Incident Report 4-5. Then, in the audio statement, Bruce reiterated and expanded on this information. Audio Statement 6:8-7:24. Nothing in the audio statement suggests that Collins "encouraged" such information out of Bruce.

The Court also disagrees that Bruce's physical or mental condition rendered him unreliable. Although Bruce was in pain and distressed during the interview, Bruce assured Collins that he understood the questions and could give a clear and accurate statement. See Audio Statement 3:12-14, 20:3-12; see also Walker v. City of Oklahoma City, 203 F.3d 837, *6 (10th Cir. 2000) (noting that "victims are often traumatized by what has happened to them" but officers may still rely on their statements if they appear coherent and reliable). Collins also testified that he observed Bruce's condition and considered his answers reliable. Collins's observations are consistent with the type of injuries Bruce sustained. His injuries were largely superficial (i.e., swelling, bruising, and a broken nose), such that he spent less than 24 hours in the hospital. There is no indication that these injuries would impact Bruce's ability to answer Collins's questions. To the contrary, Bruce's story was largely comprehensible and consistent.

These same facts undermine Newsome's argument that Bruce was mentally impaired. Newsome does not provide any medical or expert testimony to corroborate his assertions about Bruce's intellectual ability. Newsome argues merely that Bruce seems mentally impaired. Opp'n

Br. 4 ("Anyone reading or listening to the tape of the interview between Collins and Bruce senses . . . the diminished intellect . . . ."). Yet the transcript shows the opposite. Bruce provided material facts in considerable detail. Beyond those mentioned above, he also told Collins about the attackers' relationship, their physical description, one attacker's name, how often he saw them, what their roles were in the attack, what their motive was, and unequivocally stated that he could identify the attackers if he saw them again because he saw them every day. Bruce also told Collins that he attended school until the twelfth grade and understood Collins's questions, Audio Statement 3:8-25, and he did not claim to have any intellectual issues.[6] These facts, taken together, gave Collins a reasonable basis to credit Newsome's statement.

In response, Newsome points to testimony from the AP, who speculated during his deposition that Bruce was "profoundly slow" and of "very limited capacity." Morris Dep. 35:14-16, 36:12-15. The AP's testimony was not based on medical evidence, but on his impression of the Audio Statement transcript. Id. Yet the AP was not present when Bruce gave the statement, so the AP's hindsight observation is a poor yardstick for whether Collins should have recognized any impairment. More importantly, even if Bruce was "slow," that does not render him unreliable. An officer can rely on the statements of witnesses with below average mental acuity so long as the witness' statements demonstrate a reliable understanding of the incidents about which they are speaking. Bruce's answers demonstrated such an understanding, and any reasonable officer in Collins's position would have considered Bruce's statements reliable and truthful.

In sum, Bruce's answers were consistent and coherent on all main points, and were not coaxed out of him by Collins. The minor inconsistencies and his apparent low intellect would not

---

[6] Moreover, Bruce's ability to correct his prior misidentification and properly identify Elijah, both in a subsequent meeting with detectives and at trial, further undercuts Newsome's claim that Bruce was mentally impaired.

have rendered him unreliable. As such, no reasonable officer would have had serious or obvious doubts about the truth of Bruce's statements. Collins properly included Bruce's description of the event and attackers in the warrant affidavit.

### ii. Suggestive Photo Identification

Bruce's statements led Collins to attempt a photo identification of the unknown male attacker. Bruce made a positive photo identification of Newsome. Newsome maintains, however, that the identification was unreliable. The Court again disagrees.

The operative question is whether a reasonable officer would have relied on the identification of Newsome to support probable cause. See Bayer v. Twp. of Union, 997 A.2d 1118, 1134 (N.J. Super. Ct. App. Div. 2010) (affirming summary judgment of plaintiff's false arrest claim based on suggestive identification because "critical inquiry was . . . whether the officer's reliance upon [impermissibly suggestive identification] in developing probable cause was reasonable"); see also Stansbury v. Wertman, 721 F.3d 84, 91 (2d Cir. 2013) ("For the purposes of determining whether an identification can support probable cause, the basic question is whether the identification procedure was 'so defective that probable cause could not reasonably be based upon it.'") (citation omitted).

Newsome argues first that the identification was unreliable because Collins failed to follow the identification procedures set forth in the Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures. See Lindsay Cert. Ex. L, Attorney General Guidelines. Newsome claims that Collins ignored several parts of the Guidelines, which explain how photo array and sequential lineups should be carried out.[7] But as the Third Circuit

---

[7] Newsome cites in particular to the following rules: (1) where photo arrays are used, the witness should be advised that the perpetrator might not be among those in the photo array, and therefore, they should not feel compelled to make an identification; (2) where sequential photo lineups are

noted in a false arrest case, these Guidelines "only apply to photographic arrays or live line-ups," not to computerized photo databases like "mugbooks" that officers use "to see if a suspect can be found." Woodyard v. Cty. of Essex, 514 F. App'x 177, 181 (3d Cir. 2013) (citing State v. Janowski, 866 A.2d 229, 232-35 (N.J. Super. Ct. App. Div. 2005)). So the failure to follow the Guidelines alone do not automatically invalidate the photo identification.

Newsome relies extensively on State v. Henderson, 208 N.J. 208 (2011) to support his argument that nonadherence to the Guidelines should invalidate, or at least seriously undercut, the identification. In Henderson, the New Jersey Supreme Court revised its framework for determining whether an identification is admissible, and placed considerable emphasis on the Guidelines. See 208 N.J. at 919-22. However, that case concerns the admissibility of evidence in a criminal trial. It does not concern whether a photo identification can support probable cause to arrest in a false arrest case. That is a key distinction because a photo identification that is inadmissible at trial can be considered in an officer's probable cause determination. See Woodyard v. Cty. of Essex, 514 F. App'x 177, 183 (3d Cir. 2013) ("The trial court's later suppression of certain witnesses' out-of-court identifications is irrelevant to a determination of whether probable cause supported the arrest warrant and the indictment."); Bayer, 997 A.3d at 1134 (affirming trial court's finding "that the critical inquiry was not whether the out-of-court identification on which the police relied in arresting plaintiff complied with the two-step analysis governing its admissibility at trial, but rather whether the officers reliance upon it in developing probable cause was reasonable"); see also Phillips v. Allen, 668 F.3d 912, 915 (7th Cir. 2012) ("[E]vidence need

---

used and an identification is made, the officer should avoid reporting to the witness any information regarding the individual he or she has selected prior to obtaining the witness' statement of certainty; and (3) the officer should thoroughly document the identification procedure. Attorney General Guideline §§ 1.B, 2.B.6, 2.E.

not be admissible at trial in order to support a finding of probable cause.") (interpreting <u>Illinois v. Gates</u>, 462 U.S. 213 (1983)).

The Court agrees, however, that Collins's disregard of the Guidelines supports an inference that the identification was suggestive. And the fact that Collins showed photos to Newsome one-by-one without any attempt to organize them in any neutral way makes his "technique more analogous to a photographic 'show-up' than a photo lineup," which strengthens the inference of suggestiveness. <u>United States v. Barr</u>, 454 F. Supp. 2d 229, 250 (E.D. Pa. 2006), <u>aff'd</u>, 349 F. App'x 704 (3d Cir. 2009).

But a suggestive identification is not necessarily an unreliable one. The ultimate question is one of reasonableness. Taking the facts in their totality, it was reasonable to rely on the photo identification. Before the process began, Bruce told Collins that he saw the unknown man during the attack, knew him, saw him every day, described him in detail, and said he could recognize him again. During the process, Bruce appeared commitment to the finding the right person. He reviewed "several hundred" photos of people who matched Newsome's physical description and did not select anyone.[8] He did this despite making a positive identification of Adrian Zimmerman from the HIDTA six-photo display fairly quickly. This shows two things. It shows that Bruce was not simply willing to select the first person who matched the unknown male suspect's description. It also shows that Bruce had previously given an accurate description of another suspect before turning to the unknown male suspect. Then, when Bruce saw the photo of

---

[8] The number of photos reviewed by Bruce distinguishes this case from <u>Stansbury</u>, which Newsome cites for the proposition that "showing suspects singly to persons for the purpose of identification . . . has been widely condemned even when done in person." 721 F.3d at 90 (citations and quotes omitted). There, the court criticized the police for showing the witnesses a single photo. Here, Newsome reviewed hundreds. And even so, the court in <u>Stansbury</u> found that the flawed presentation, though inadmissible at trial, still supported a finding of probable cause to arrest. <u>Id.</u> at 90-91.

Newsome, he immediately selected it and expressed a high level of certainty. Not only did this sequence of events give Collins good reason to trust Bruce's identification, but (as Newsome admits) the photo Bruce selected matched the facial characteristics that he described earlier. See Opp'n Br. 7 ("Newsome is a bald, light-skinned black male, who unfortunately facially resembles the man Bruce had identified"). Finally, the identification happened three days after the incident, which is close enough in time to trust Bruce's recollection. See Wilson, 212 F.3d at 791 ("There were three days between the crime and identification, so while it was not an entirely fresh identification, not so much time had passed as to call into question [the witness'] recollection.").

Conversely, there is no evidence that Collins rushed Bruce through the process or said anything about the Newsome photo before Bruce selected and signed it. And although Bruce was in pain, he assured Collins that he could make an accurate identification and Collins's observations of Bruce corroborated his ability to do so.

Newsome responds with two points. He argues that Collins should have given Bruce pre-identification instructions and that Newsome's photo showed only his face, leaving Bruce unable to gauge Newsome's full stature. The Court agrees that these points would strengthen the reliability of the identification—indeed the Court recognizes that the identification was imperfect, and this would be a much simpler case if Collins had taken many of the steps suggested in the Attorney General Guidelines. But those flaws do not render the entire identification unreliable. Based on the totality of the circumstances, it was reasonable for Collins to rely on the identification in support of the arrest warrant.

### iii. Exculpatory Evidence

Lastly, Newsome argues that there was enough exculpatory evidence to render the positive identification invalid.

Identification of an offender by a victim usually is sufficient to establish probable cause, but "independent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist." Wilson, 212 F.3d at 790.

Here, Newsome points to four pieces of exculpatory evidence: (1) Newsome was shorter than the man Bruce described; (2) Newsome lived almost 100 miles away from the daycare; (3) the daycare owner denied knowing Newsome; (4) Newsome was not married to the daycare owner; and (5) Newsome did not have a criminal record. Because the parties dispute whether these facts were omitted from the application before Judge Williams, the Court assumes they were.

The Court agrees with Newsome that it was reckless to omit all of these facts, except for the absence of a criminal record. Since Newsome was shorter than described, was not related to the daycare owner, and lived relatively far away,[9] there was some discrepancy between Bruce's description of the unknown man and Newsome. That opens up the possibility that Newsome was not that man, a fact that Collins was obligated to consider. See Wilson, 212 F.3d at 790 ("An officer contemplating an arrest is not free to disregard plainly exculpatory evidence . . . .") (citation omitted). As such, "[a]ny reasonable person would have known" these additional facts are "the kind of thing[s] the judge would wish to know." Andrews, 853 F.3d at 698. And Collins arguably knew these facts when he sought the warrant at the end of October. He admits he saw the height difference when he pulled Newsome's DMV info during the October 12 interview. He also admits he spoke to the daycare owner (he does not say when so we will assume it was before he sought the warrant). And although he does not admit it, he could have known that Newsome was not

---

[9] Collins says he told Judge Williams that Newsome lives in Glassboro, New Jersey; but that is not the same as saying that Glassboro is almost 100 miles away.

married to the daycare owner based on his review of the Accurint results and his discussion with the daycare owner.  As such, a reasonable jury could conclude that these withheld facts were "in his ken."  Id.

The Court reaches the opposite conclusion as to his lack of a criminal record.  A suspect's clean record does not affect the chance that he or she committed a particular crime on a particular day.  Indeed, "[i]t is not so unusual that a defendant without a criminal history might engage in criminal behavior."  See United States v. Call, No. 09-79, 2009 WL 6047137, at *8 (D. Nev. Nov. 24, 2009) report and recommendation adopted, No. 209-79, 2010 WL 932599 (D. Nev. Mar. 11, 2010).  Since the absence of a criminal record does not impact (positively or negatively) probable cause, it need not be brought to the judge's attention.

That leaves four recklessly omitted facts.  The Court must now "present a reconstructed affidavit that . . . includes [the] omitted evidence."  Id. at 699-700.  The reconstructed affidavit reads as follows:

> On Sunday, October 9, 2011 at 8:42 p.m., two City of Newark police officers responded to an assault in progress at the corner of 18th Avenue and West End Avenue in Newark, New Jersey.  Upon their arrival, the officers saw Jermain Bruce injured and handcuffed to a grate.  Bruce told the officers that two men, one by the name of Adrian, approached him with three unknown women and accused him of breaking into the day care center located in the same building where Bruce lives.  The five people attacked him with metal bats and handcuffed him.  Bruce said that the people who attacked him worked at the daycare.  Bruce suffered minor bruises, swelling, and a broken nose.
>
> On October 12, 2011, Detective Collins took an audio statement from Bruce.  Bruce identified the other unknown man as the daycare owner's husband and Adrian's stepfather.  Bruce told Collins that he could recognize the attackers if he saw them again.  He described the unknown man as light-skinned, bald, slim, and about 6'2" to 6'5".
>
> Collins entered the unknown man's description into the HIDTA system, but Bruce did not recognize him from hundreds of photos.  Collins then showed Bruce individual photos of men in the Accurint system who had a connection to the daycare address through a woman with his same last name.  Bruce identified the

DMV photograph of John Newsome as the other male attacker. According to his DMV photo, Newsome is light-skinned and bald. **[Newsome is actually 5'9", not 6'2" to 6'5" as Bruce stated in his audio statement.]** Bruce signed and dated the photo of Newsome.

    **[Collins later spoke with the daycare owner, but she claimed she did not know Newsome.] [Collins also learned that Newsome is not married to the daycare owner as Bruce stated, but to Robin Newsome whose father owns the building owner]. [Newsome and his wife live in Glassboro, New Jersey, which is about 100 miles away from the daycare.]**

    Based on the facts enumerated above, the affiant contends that a warrant should issue on probable cause that John Newsome committed aggravated assault against Jermain Bruce.

The Court must now decide whether these newly added facts "could outweigh the identification or undermine reliance on it." Andrews, 853 F.3d 701. The Court finds that the identification still stands and the affidavit still gives rise to probable cause.

Newsome forcefully argues that the height difference (5'9" instead of 6'2" to 6'5") was material. The Court disagrees, finding support in the Third Circuit's Wilson decision. There, a police officer claimed that probable cause for a warrant existed because a robbery victim positively identified Wilson from a photo array. Wilson, 212 F.3d at 785. When the officer sought the arrest warrant of Wilson, he did not tell the judge that the victim estimated the robber's height on the day of the crime to be 6'2" to 6'4", but the man she identified three days later in a photo lineup (Wilson) was only 5'11". Id. The Third Circuit ruled that "this indication of unreliability does not, from the vantage point of the arresting officer, fatally undermine the forceful positive identification." Id. at 791. The court also noted, however, that different facts could produce different results. For example, it stated that there could be "substantial evidence of the witness's own reliability" if the witness described a victim as 7' tall but selected a person who is only 5' tall. Id. at 790. The court gave this illustrative example to explain that materiality is grounded in common sense and "glaring

discrepancies in a witness' testimony can undermine the reliability of a witness who provides a positive identification." Andrews, 853 F.3d at 702 (interpreting Wilson).

Newsome's case is close enough to Wilson to compel the same result. Here, as in Wilson, Bruce gave a forceful identification of Newsome, who was only a few inches shorter than the person Bruce described. Of course, this case involves a slightly larger discrepancy: Bruce was five inches shorter than described; Wilson was three inches shorter. However, the difference of two inches does not make the discrepancy glaring. Indeed, it is far closer to Wilson's case than the two-foot discrepancy in the court's example. See also Stackhouse v. City of E. Orange, No. 07-05502, 2012 WL 359727, at *5 (D.N.J. Feb. 1, 2012) (finding that five inch difference (5'8" to 6'1") "sufficiently match[ed] the description"). And other cases that have found material discrepancies in height involved more egregious errors. See Robinson v. Winslow Twp., 973 F. Supp. 461, 471 (D.N.J. 1997) ("A reasonable jury could conclude that . . . the police should have known that the eyewitnesses simply could not have described a 5'4" man as being six foot tall."). Ultimately, the height difference in this case does not "fall well outside common-sense margins of error that typically apply to witness' subjective observations involving estimation and approximation." Andrews, 853 F.3d at 702 n.14.

The Court does not reach its conclusion in a vacuum. It views the error in context of other identifying information Bruce conveyed to Wilson, much of which was corroborated. Bruce stated that he knew the attacker from previous encounters; he selected a person whose facial features strongly resembled the description; and Newsome's weight aligned with Bruce's approximation.[10] Moreover, unlike Wilson, where the victim said she could identify the robber precisely "because

---

[10] Bruce described the attacker as "a little slimmer" than Adrian, who Bruce described as about 220 pounds. Audio Statement 17:13-15; Incident Report 4. The DMV report listed Newsome as up to 180 pounds. Collins Dep. Ex. 8, DMV Response.

of his noticeable height," Wilson, 212 F.3d at 784, Bruce said he could identify the suspect because of their previous encounters. Since Bruce did not use the suspect's height as key identifying factor, Bruce's mistake is even less notable.

The Court is equally unpersuaded by Newsome's second argument that the 100 mile distance between Glassboro and Newark is material. Newsome suggests that this distance makes it highly unlikely that Newsome worked or went to the daycare center almost every day. As many commuters come to know, however, it is not so improbable that a person would make a daily commute that amounts to somewhere between one and two hours. This fact does not invalidate Bruce's identification.

Newsome's third argument that the daycare owner denied knowing who Newsome was is also insufficient. Newsome would have the Court read too much into the owner's answer. That is, he suggests that it should have tipped off Collins that Newsome had no connection to the attack. But that is not a foregone conclusion. In fact, it makes more sense that Collins would take the owner's statements with a degree of skepticism. He knew she was not a disinterested party: Collins was looking for a suspect who committed an assault in retaliation for breaking into the woman's daycare; and several members of the woman's family were prime suspects in the case. So she had a clear motive to lie to the investigator, or at least not aid in the investigation. Moreover, Collins had other information that suggested she knew the attackers. Collins explained that Bruce called a few days after the October 12 interview to say that Adrian Zimmerman was outside the daycare. That fact corroborated part of Bruce's story and creates a reasonable possibility that the daycare owner knew Adrian as well as the other male suspect. As such, Collins should have factored the owner's denial into the total mix of evidence, but Collins was not required to take it at face value. See Wright, 409 F.3d at 603 ("[Probable cause] does not require that officers

correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate.").

In fact, Newsome's fourth argument explains why Collins should have suspected him despite not having a connection to the daycare owner. Newsome argues, "[a]t the time Collins triggered the information provided by the Accurint system, he knew or certainly should have known that John Newsome was related . . . to Robin Newsome, who in turn was the daughter of the owner of the building." Assuming Collins knew that Robin Newsome was not the daycare owner when he ran the Accurint search, that fact opened up a different reason to suspect Newsome: his father-in-law owned the building. Thus, the motive for the assault (retaliation for a breaking into the building) applies with equal force to Newsome because he was related to the owner of the property that was burglarized. And Newsome's connection the building also explains why Bruce would have seen him there even if he did not work at the daycare. As such, this final fact opened up as many investigative doors as it closed. It did not render the identification unreliable.

At bottom, Newsome claims that all of these issues could have been avoided if Collins investigated further. He claims that Newsome's innocence would have been clear if Collins had tracked down and confirmed who the daycare employees were and to whom they were related. No such further investigation was necessary here. Where an officer has established probable cause, he is "not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed." Merkle v. Upper Dublin School Dist., 211 F.3d 782, 790 n.8 (3d Cir. 2000) (citation omitted); see also Davis v. Malitzki, 451 F. App'x 228, 233 (3d Cir. 2011) ("[E]vidence that might exonerate a defendant does not defeat probable cause."). By the time Collins sought the warrant, he had a reliable positive identification from a victim-witness and a successful identification and arrest of the other male

suspect. Collins reasonably believed that probable cause existed to seek Newsome's arrest; he did not have to investigate further.

### B.  Section 1983 Malicious Prosecution Claim Against Collins (Count 2)

In Count Two, Newsome asserts a malicious prosecution claim against Collins. Malicious prosecution requires, among other things, evidence that the defendant initiated the criminal proceeding and the proceeding was initiated without probable cause. <u>DiBella v. Borough of Beachwood</u>, 407 F.3d 599, 601 (3d Cir. 2005).

Here, the criminal proceeding was initiated when Collins sought the arrest warrant. Because the police had probable cause to arrest Newsome as explained above, his malicious prosecution claim also fails. <u>See</u> <u>Estate of Smith v. Marasco</u>, 318 F.3d 497, 521 (3d Cir. 2003) (holding that a malicious prosecution plaintiff must show, inter alia, that the criminal proceeding was initiated without probable cause); <u>Gresh v. Godshall</u>, 170 F. App'x 217, 220 (3d Cir. 2006).

### C.  Section 1983 Supervisory Liability (Count Three)

In Count Three, Newsome sues the City of Newark, Chief Coley, and Director Demaio under a § 1983 failure to train theory. Because the Court has not found any underlying violation, there can be no claim for failure to train. <u>Gravely v. Speranza</u>, 219 Fed. App'x. 213, 216 (3d Cir. 2007) (per curiam) ("Because there was no underlying Constitutional violation, the claims of conspiracy and failure to train also fail.").

### D.  Claims under New Jersey Law (Count Five)

Finally, in Count Five, Newsome sues Collins and the City of Newark for false arrest, false imprisonment, and malicious prosecution under New Jersey law. Under New Jersey law, "[t]he existence of probable cause is an absolute defense to claims of false arrest, false imprisonment, and malicious prosecution." <u>Williams v. City of Newark</u>, No. A-1589-14T1, 2016 WL 1396283,

at *18 (N.J. Super. Ct. App. Div. Apr. 11, 2016) (citing <u>Wildoner v. Borough of Ramsey</u>, 162 N.J. 375, 389 (2000)).  These state law claims fail as well.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED** as to all counts.

*/s Madeline Cox Arleo*_____
**MADELINE COX ARLEO**
**United States District Judge**
